OPINION OF THE COURT
Michael R. Juviler, J.
This action under CPLR article 78 raises questions as to the proper method for replacing services supplied pursuant to a city-wide contract for transportation of handicapped public school students, if the bus company defaults. Petitioner, another contractor, claims that the contract provides the method, without public bidding. Respondent Board of Education of the City of New York maintains that the contract does not apply and that new public bidding is required.
In 1979, the board of education, after public bidding pursuant to law, entered into a contract with petitioner Master Coachman, Inc., and some 130 other bus companies for the supplying of transportation service to handicapped students. More than 1,000 vehicles were hired in the five boroughs, in four categories: “standard school buses”, “hydraulic lift buses”, “mini-bus station wagons”, and “minibus or station wagons equipped with ramps to accommo *966 date wheelchairs”. The contract has been extended and is still in effect.
While the contract was in force, a long strike of school bus drivers in New York City took place. Settlement of the strike included an agreement by the board of education that all contractors supplying more than five vehicles would employ only union members chosen from a master list on the basis of seniority.
A number of contractors have defaulted since 1979, requiring the board of education to replace their services.[1] At issue here are two such items in the contract, BBX — MW-1A, calling for five mini-wagons in The Bronx, and WQMW, calling for five mini-wagons in Queens. When these two suppliers defaulted, respondent, relying on section 103 of the General Municipal Law and subdivision 14 of section 305 of the Education Law, publicly solicited bids for these buses, plus an additional vehicle for each item. The increase from 5 to 6 vehicles in each borough was prompted by respondent’s reasonable conclusion that in view of the agreement reached to settle the strike it was in the interest of labor-management relations to hire 6 buses instead of 5. Petitioner does not challenge respondent’s need for the sixth vehicle under the circumstances.
After bids were publicly solicited and received for the 12 buses, 6 for each item, petitioner brought this action under CPLR article 78 to enjoin respondent from awarding the contracts by public bidding, and to compel respondent to hire the 12 buses by using the system specified in article XIII of the existing contract. Under that system, if there is an “increase” in the need for a specific type of vehicle in a specific region during the life of the contract, the board of education may ask the “contractor” currently providing that item to provide the “increase” in service. If that contractor declines, the offer is made to the “contractor” providing the same service with the next lowest price, if there is such a “contractor”. If not, the offer can be made to a “contractor” in an adjoining borough. If this formula has *967 to be used, petitioner will gain the contract in The Bronx and another contractor will obtain it in Queens.[2]
Petitioner’s contention that article XIII covers the present situation is incorrect. Article XIII applies only to an “increase” in service, not to replacement of services already provided by a contractor who defaults, in this case the five mini-buses in each county. The contract provides in plain terms that if “during the period of the contract the number of vehicles required for a specific type of service increases,” then “the increase,” not the original need, shall be offered to existing contractors according to the contractual formula (emphasis added). Petitioner notes that citywide there has been an increase in the over-all need for services, but that does not activate article XIII in this case. Article XIII carefully defines “a specific type of service” needed as “service area and type of vehicle” (see subd A). In this case, that means mini-wagons in The Bronx, and mini-wagons in Queens. Replacement of the five mini-wagons previously supplied by a defaulting contractor is not an “increase” in this “specific type of service”.
Petitioner also contends that by increasing the required vehicles from 5 to 6 in the two contested items, respondent rendered all 6 vehicles an “increase” covered by article XIII. This construction of article XIII fails to account for the language just discussed, which in referring to an “increase” distinguishes between the needs previously supplied and the additional needs arising during the life of the contract.
The other flaw in this contention by petitioner is that article XIII does not cover defaulted items at all, whether replaced in the same amounts or in larger amounts. The only treatment of defaults in the contract is an entirely separate provision, article XXI, dealing in great detail in three pages with liquidated damages for various types of defaults. The parties plainly contemplated defaults, and can be expected to have referred to them in article XIII if that article had been intended to include such an important subject as defaulted items.
By contrast, the language of article XIII assumes that an existing “contractor”, still supplying services, will be “of *968 fered” first crack at supplying additional vehicles of the same type in the same area. It expressly provides that vehicles which this “initial, offeree” cannot furnish may then be solicited from the “next contractor”. This language is inapplicable to previous contractors who have been declared in default. It would be senseless to offer such defaulting companies an opportunity to supply even more services than they have been able to supply in fulfillment of their contractual obligations. Rather than being designed to cover defaults, article XIII was designed to cover an entirely different subject: It was intended to provide a convenient, fast, fair method for dealing with a modest “Increase or Decrease in the Number of Vehicles” demanded by changes in the needs of a large, complex school system during the life of the contract. That is clear from the language of article XIII as a whole, and its construction by the courts in earlier CPLR article 78 actions in other contexts (see Tufaro Tr. Co. v Board of Educ., 79 AD2d 376; Matter of Staten Is. Bus v Board of Educ., 82 AD2d 891, affd 54 NY2d 705).[3]
Inexplicably, bureaucrats in respondent’s agency, without consulting counsel, replaced several defaulted items, before default of the contested two items, by resort to the procedure set forth in article XIII. Respondent is not es-topped by this previous action of its employees from asserting a different interpretation of the contract and its responsibilities, and petitioner does not claim estoppel (see Public Improvements v Board of Educ., 56 NY2d 850). While the earlier interpretation of the contract by respondent’s purchasing agent is entitled to some weight, as petitioner urges, it does not outweigh the reasons discussed above for rejecting it.
Petitioner’s remaining claim is that even if the five vehicles previously needed are not an “increase” covered by article XIII and may be hired by public bidding, the *969 sixth vehicle is an “increase” and must be hired by using the formula in article XIII. But as was previously discussed, article XIII does not apply to defaulted items, even if they are increased when resolicited.
Moreover, it would be absurd to have public bidding for the five original buses but hire the sixth bus from a different contractor under article XIII.
The petition is therefore dismissed.
APPENDIX
XIII. INCREASE OR DECREASE IN THE NUMBER OF VEHICLES
“a. Decrease. At any time during the period of the Contract the number of vehicles required may be reduced and the schedules may be adjusted due to change in pupil population, or change in policy or directive adopted by the Board of Education, the City of New York, the State Education Department, and/or the Financial Control Board, or other factors; provided, however, that in no event shall the total number of any type of vehicle originally awarded to a contractor be reduced: (1) by more than ten percent (10%) of the total number of any type of vehicle originally awarded in the first year of this Contract; (2) in the second year of this Contract, by more than twenty percent (20%) of the total number of any type of vehicle originally awarded; and (3) in the third year of this Contract by more than thirty percent (30%) of the total number of any type of vehicle originally awarded. Compensation to the contractor shall be reduced to the number of vehicles actually used in the performance of this Contract, and the Board of Education shall not be liable for payments for any vehicles eliminated to the extent provided above.
“Upon determination by the Director that there is a decrease in the number of vehicles required for a specific type of service (service area and type of vehicle) during the period of this Contract, the Board of Education reserves the right to reduce the number of vehicles for a specific type of service as follows:
“(1) If the total number of vehicles at the time of decrease does not exceed the total number of vehicles originally contracted for, such reduction shall apply to the contractor who quoted the highest weighted average daily rate per *970 vehicle and shall apply subsequently to the contractors who quoted the next highest weighted average daily rates per vehicle until all necessary reductions are made.
“(2) If the total number of vehicles at the time of the decrease exceeds the number of vehicles originally contracted for, such reduction shall first be made from the additional vehicles contracted for during the performance of this Contract and shall apply first to the highest weighted average daily rate per vehicle, and subsequently to the contractors who quoted the next highest weighted average daily rates per vehicle until all necessary reductions are made. After the reduction of these additional vehicles is exhausted, the Director may reduce the number of vehicles originally contracted for in accordance with XIII.A(l) above.
“b. Increase. If at any time during the period of the Contract the number of vehicles required for a specific type of service increases, the Board of Education reserves the right to increase the number of vehicles for a specific type of service as follows:
“(1) If the total number of vehicles at the time of the increase is the total number or in excess of the total number of vehicles originally contracted for, the increase shall first be offered to that contractor who quoted the lowest weighted average daily rate per vehicle. Opportunity to furnish such vehicles as the initial offeree cannot furnish may then be offered to the next contractor with the next lowest weighted average daily rate per vehicle. If no contractors providing a specific type of service are found willing to supply additional service of the same type, then the Board may offer the opportunity to provide the additional vehicles to a contractor in any adjacent borough in the manner set forth. The initial offer will be made to that contractor with the lowest weighted average daily rate for that type of vehicle for which none of the successful bidders for that type of service were willing to provide additional vehicles as provided above.
“(2) If the total number of vehicles at the time of the increase is less than the total number of vehicles originally contracted for, and there is a subsequent need for these *971 vehicles, the contractors who had their number of vehicles reduced shall be afforded the right of first refusal for reinstatement of the use of these vehicles in inverse order to that by which they were reduced pursuant to XIII.A above.
“All additional vehicles provided throughout the entire period of the Contract must comply with all the terms, conditions and specifications of the Contract set forth herein. The contractor will be compensated for such additional vehicles as provided for herein.
“c. Notice and Liability. The contractor shall be notified at least five (5) school days in advance of the date the above changes are effective. If the contractor is willing to furnish the required additional vehicles, he shall confirm such agreement in writing to the Director within five (5) business days of receipt of the offer.
“If the above changes, when effective, terminate the need for any part of the services rendered by a particular contractor, the Board of Education and the City of New York (or any political or governmental subdivision thereof) shall not be liable for any damages or cost of the contractor as a consequence thereof.”

. Petitioner’s papers refer to eight defaulted items; counsel for respondent orally reported that there are 17 out of 140 in the contract.

. Article XIII is set forth in the Appendix to this opinion.

. Perhaps article XIII should be amended when it expires in 1984, to cover defaulted items with or without an increase. It would appear that even defaults of substantial items could be covered by a new article XIII. The requirements of public bidding would be satisfied when the original contract was bid upon. Each successful bidder would be contracting not only for its own services, but also for an option to provide services supplied by other contractors who default during the term of the contract.